UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------------X

YISRAEL Z. HEILMANN,                          Civil Action No. _____


                        Plaintiff,           **COMPLAINT**

                                             **JURY TRIAL DEMANDED**


         -against-


YESHIVA UNIVERSITY,



Defendants.

--------------------------------------X

Heilmann v. Yeshiva University| Fraudulent Solicitation of Donations and Public Misrepresentation | Case No. [TBD] | U.S. District Court – Southern District of New York

Plaintiff **Yisrael Z. Heilmann**, proceeding **pro se**, brings this civil action against

Defendant **Yeshiva University** and alleges as follows:

# Preliminary Statement

1. **Nature of the Action:** This is a civil action for fraud and deceptive practices arising from Yeshiva University's fraudulent solicitation of donations and public misrepresentations. Yeshiva University ("YU" or "Defendant") has **knowingly and systematically misled current and prospective donors**, as well as the public, about material facts including campus safety, its adherence to non-discrimination policies, and the integrity of its administration. Through glossy fundraising campaigns and public statements, YU has portrayed itself as a **safe, inclusive, and ethical institution**, all while concealing incidents of campus violence, discrimination, and administrative misconduct that contradict these portrayals.

2. **Scheme to Defraud Donors and the Public:** Over a period of years, YU engaged in a **deliberate scheme to solicit millions of dollars in donations under false pretenses**. It repeatedly made **fraudulent misrepresentations and omissions** in mailings, emails, brochures, and public statements – assuring donors that the University provides a "safe haven" for students and "rejects discrimination of all kinds," and that it maintains the highest standards of campus safety and ethics. In reality, YU's administration was aware of serious *undisclosed problems* on campus, including a violent student-on-student assault and ongoing discriminatory practices, which it actively **suppressed or minimized** to avoid alarming donors and the public. YU officials, *upon information and belief*, orchestrated

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva University| Fraudulent Solicitation of Donations and Public Misrepresentation | Case No. [TBD] | U.S. District Court – Southern District of New York

these misrepresentations to protect the University's reputation and funding, rather than to address the underlying issues.

3. **Good Faith and Purpose:** This Complaint is filed in good faith and in compliance with Rule 11(b) of the Federal Rules of Civil Procedure. Plaintiff affirms that the factual contentions herein have evidentiary support or, at minimum, **are likely to have support after a reasonable opportunity for further investigation or discovery**, and that the legal contentions are warranted by existing law or nonfrivolous arguments for extending the law. The Complaint is **not being presented for any improper purpose**, such as to harass or needlessly increase the cost of litigation. Plaintiff's sole intent is to expose and rectify YU's fraudulent conduct and to seek relief for the harm caused by that conduct.

4. **Harm to Plaintiff and Public Interest:** YU's deception has caused direct and consequential harm to Plaintiff and the broader community. Plaintiff – a student who entrusted his education and reputation to YU – has suffered significant **reputational harm, loss of trust, and emotional injury** upon discovering that he was involuntarily associated with an institution engaged in deception. Donors have likewise had their trust abused; their charitable intent was subverted by YU's false portrayals of its campus environment and values. By **perpetrating fraud on its own supporters and the public**, YU has undermined public trust in the integrity of the institution. This action seeks to hold YU accountable for its fraudulent solicitation of donations and to recover damages for the injuries caused, including **compensatory and punitive damages at the maximum level credibly supported by the evidence**, in order to deter such egregious misconduct.

## Jurisdiction and Venue

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva University| Fraudulent Solicitation of Donations and Public Misrepresentation | Case No. [TBD] | U.S. District Court – Southern District of New York

5. **Subject Matter Jurisdiction:** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the laws of the United States prohibiting fraud, including the federal mail and wire fraud statutes (18 U.S.C. §§ 1341 and 1343). The Court also has supplemental jurisdiction over the related state law claims (e.g. claims under New York General Business Law § 349) pursuant to 28 U.S.C. § 1367, as those claims form part of the same case or controversy. In addition, to the extent diversity jurisdiction is applicable, the requirements of 28 U.S.C. § 1332 are satisfied: Plaintiff is a citizen of a different state or a foreign citizen (Plaintiff is of German origin) and Defendant Yeshiva University is a citizen of New York, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. **Venue:** Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) because Yeshiva University is headquartered and conducts its principal operations in this District (New York, NY), and a substantial part of the events or omissions giving rise to the claims occurred in this District. YU's fraudulent donation solicitations and misrepresentations were made from and directed to parties within this District, and the effects of its misconduct were felt here. Moreover, Plaintiff was a student on YU's New York City campus during the events in question, and the campus safety and misconduct issues at the heart of this case occurred in New York, NY.

# Parties

7. **Plaintiff:** Yisrael Z. Heilmann is an individual who at all relevant times was a student enrolled at Yeshiva University in New York, NY. Plaintiff is currently residing in New York City (while attending YU) but is a citizen of [Germany]. He brings this action **pro**

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva University| Fraudulent Solicitation of Donations and Public Misrepresentation | Case No. [TBD] | U.S. District Court – Southern District of New York

**se** in his own capacity. As a student and member of the YU community, Plaintiff was an intended beneficiary of YU's representations about its campus environment and also a potential future donor (and representative of the alumni/donor community). Plaintiff has suffered personal harm as a result of YU's fraudulent conduct, including damage to his reputation, emotional distress, and other non-economic and quasi-economic injuries described herein.

8. **Defendant:** Yeshiva University is a private, not-for-profit **Orthodox Jewish university** incorporated in New York, with its principal campus and administrative offices located in Manhattan, New York City. YU operates multiple campuses in New York City and receives substantial funding from charitable donations, grants, and tuition. It is an institution engaged in interstate commerce and solicits contributions and students nationally and internationally. At all relevant times, Yeshiva University acted through its agents, employees, trustees, and officers, who were responsible for the fundraising communications and public statements at issue. YU is the sole Defendant in this action.

# Statement of Facts

## Yeshiva University's Public Image and Solicitations to Donors

9. **Reliance on Donor Funding:** Like many universities, Yeshiva University is heavily dependent on philanthropic donations from alumni, community members, and large benefactors to fund its operations and programs. Donations are a lifeblood of YU's budget, supporting scholarships, campus facilities, and new initiatives. YU actively **markets itself to donors** as an institution worthy of their trust and financial support, often invoking its

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva University| Fraudulent Solicitation of Donations and Public Misrepresentation | Case No. [TBD] | U.S. District Court – Southern District of New York

religious mission and purported values to encourage generosity. Fundraising campaigns often highlight YU's commitment to providing a safe and morally upright environment for students, thereby assuring donors that their money will uphold noble causes and protect the welfare of the student body.

10. **Cultivation of a Virtuous Reputation:** In its public-facing materials and events, YU has **consistently cultivated an image of an institution with exceptional integrity, safety, and inclusivity**. For example, YU's President and administrators have promoted YU as a uniquely safe haven for students, especially compared to other universities. In 2024, YU widely publicized the creation of a "safe haven" program for Jewish students transferring from other colleges, with a joint statement boasting that *"Yeshiva is providing a safe haven for these students… where they could live and study free of fear for being who they are."* YU's messaging emphasizes that it *"rejects discrimination of all kinds"* and stands for tolerance and inclusion. Similarly, YU officials have publicly stated that the university is a *"safe environment for students to be in,"* free from the problems (such as rampant drugs, alcohol, or harassment) that might plague other institutions. These representations are disseminated to the public and to donors through press releases, alumni newsletters, fundraising brochures, the YU website, and solicitation letters.

11. **Solicitation of Donations through Mail and Wire:** YU regularly solicits donations via **mailings and electronic communications**. Fundraising letters are sent through U.S. mail to alumni and supporters, highlighting YU's achievements and the well-being of its students, and often *omitting any negative information* that might cause concern. Likewise, YU's email campaigns and website donation portals are used to encourage online gifts, presenting carefully crafted narratives of YU's success, safety, and values. For instance,

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva University| Fraudulent Solicitation of Donations and Public Misrepresentation | Case No. [TBD] | U.S. District Court – Southern District of New York

during its annual fundraising drives, YU's development office sends glossy mail brochures touting the University's "world-class education in a values-driven, secure environment," accompanied by personal stories of student accomplishments. These materials implicitly and explicitly represent to donors that YU's campuses are safe and that the administration adheres to high ethical standards. Donors are invited to "partner" with YU by contributing funds, under the assurance that YU is living up to the ideals it advertises.

12. **Material Representations on Safety and Integrity:** Among the key **material representations** YU has made to donors and the public are statements concerning:

(a) **Campus Safety** – YU assures that it maintains a campus atmosphere where students can study without fear of crime or harm, emphasizing security measures and a low incidence of campus violence; (b) **Non-Discrimination and Inclusivity** – YU claims that it does not tolerate discrimination or harassment, and that every student is treated with equal dignity (often invoking the institution's religious and moral ethos as evidence of its commitment to justice); and (c) **Administrative Integrity** – YU projects that its leadership is transparent, law-abiding, and proactive in addressing any issues, thereby implying there are no hidden scandals or misconduct. These representations are **material** in that a reasonable donor would consider campus safety, nondiscrimination, and administrative honesty important factors in deciding whether to donate to the University. In fact, YU intentionally highlights these points to **bolster donor confidence** and encourage continued and increased donations.

13. **The Reality Concealed by YU:** In stark contrast to YU's rosy public portrayals, the **reality within Yeshiva University has been markedly different**. During the period that YU was assuring donors and the public of its exemplary environment, YU's administration was

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva University| Fraudulent Solicitation of Donations and Public Misrepresentation | Case No. [TBD] | U.S. District Court – Southern District of New York

aware of serious problems undermining those assurances. These problems included, **but were not limited to**:

- **a. Violent Campus Incident:** On March 21, 2024, Plaintiff Yisrael Heilmann was **violently assaulted on campus by a fellow student** (a then-student named Sapir Amar) in an unprovoked attack. Plaintiff was physically injured and traumatized by this assault. This incident directly contradicts YU's claim of a campus "free from the worry of crime". YU's Security Department and administrators became aware of the attack, yet the University *failed to adequately publicize or warn the campus community* about this serious safety incident. Upon information and belief, YU did not include or fully disclose this assault in its campus crime statistics or Clery Act reporting in an transparent manner, nor did it inform donors that a student had been beaten on campus. Instead, YU continued to maintain publicly that its campus was exceptionally safe, **misleading donors** who would rightfully be alarmed by such violence on school grounds.

- **b. Discrimination and Title IX/Equality Issues:** YU has been embroiled in high-profile discrimination controversies even while it insisted to donors that it "rejects discrimination of all kinds." For example, YU's long-running refusal to officially recognize an LGBTQ+ student club became public knowledge, resulting in litigation and public criticism in 2022–2023. Rather than acknowledge this issue to its donor community, YU's leadership privately claimed a religious exemption, even as it had **publicly represented itself as a nonsectarian institution to obtain state funds**. New York state officials have noted that YU appeared to **misrepresent its institutional status** to secure over $230 million in public funding, highlighting YU's pattern of saying one thing to one audience and the opposite to another. This pattern extended to donor communications: YU did not inform donors of the

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva University| Fraudulent Solicitation of Donations and Public Misrepresentation | Case No. [TBD] | U.S. District Court – Southern District of New York

discrimination lawsuit or its stance against the Pride Alliance in fundraising materials – on the contrary, YU continued to imply it was an inclusive community. Additionally, Plaintiff himself faced a hostile environment at YU due to his perceived differences (Plaintiff is of European origin and has documented disabilities). YU administrators failed to protect Plaintiff from harassment and were deliberately indifferent to discrimination he experienced. These facts, had they been known, would have been material to donors who believe they are supporting an institution that exemplifies tolerance and lawful behavior.

- **c. Administrative Misconduct and Concealment:** YU's administration has engaged in **misconduct to conceal or minimize negative information** that might jeopardize its reputation. In Plaintiff's case, after the on-campus assault and after he raised complaints about safety and discrimination, YU officials (on information and belief) took steps to **obstruct investigations and retaliate** against Plaintiff for speaking out. Rather than disciplining the offending student publicly or ensuring accountability, YU handled the matter non-transparently – effectively sweeping it under the rug. YU has a history of opacity in such matters; for instance, in a prior unrelated scandal, YU declined to release the full results of an independent investigation into abuse allegations, despite public promises of transparency. This culture of concealment permeated the handling of Plaintiff's situation and other incidents. By concealing vital facts about campus safety threats, ongoing litigation and complaints, and internal misconduct, YU ensured that **donors and the public were kept ignorant of truths that would reflect poorly on the institution**.

14. **Knowledge and Intent:** Yeshiva University's leadership knew or **were willfully blind to the falsity** of their public statements at the time they were made. Senior administrators and development (fundraising) personnel were contemporaneously aware of the March 2024

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

assault on Plaintiff and the ensuing safety concerns, as well as the active discrimination controversies and other misconduct issues. Despite this knowledge, YU's agents **knowingly decided not to disclose** these material facts in donor communications. Instead, they persisted in painting a false picture. The misrepresentations were not accidental or incidental — they were part of a calculated strategy to **induce donations** and preserve YU's public image. Internal discussions (which Plaintiff expects to uncover in discovery) will show that YU officials were concerned that if donors learned of these issues, they might withdraw financial support or demand changes. Thus, YU **acted with intent to deceive**: it deliberately lied by omission and commission, with the aim that donors would rely on the clean, positive image of YU and continue contributing financially.

15. **Donor Reliance and the Impact on Donor Intent:** Donors did in fact rely on YU's representations and omissions. For example, many alumni donors give to YU because they believe it provides a uniquely safe and values-driven college experience for Jewish students – a belief YU has actively cultivated. Major donors like the Wilf family (namesakes of YU's main campus) publicly voiced **expectations of tolerance and inclusion**, implicitly trusting YU to uphold those principles. Had these donors been aware that YU was actually engaging in discriminatory practices and covering up safety issues, their giving decisions would likely have changed. Indeed, the Wilf family and over a thousand alumni expressed disapproval and concern when YU's true actions came to light in the context of the LGBTQ+ club dispute. This demonstrates that **donor intent and public trust were materially affected** once the misrepresentations began to unravel. Other donors, upon learning of YU's misrepresentations, would feel betrayed that their contributions were obtained through false pretenses. Plaintiff, although not yet a donor at the time, was a

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

tuition-paying student and a member of the community whose family, friends, and future career prospects all factored in YU's reputation; he and those around him relied on YU's honesty about its environment. The erosion of donor trust is evident and damaging: for instance, at least one prominent donor (Robert Kraft) chose to donate $1 million to YU in 2024 believing YU offered a safe environment that other universities lacked – a belief YU encouraged. If it turns out YU's environment was not as portrayed, donors like him have been misled and their donations effectively procured by fraud.

16. **Plaintiff's Reliance and Injury:** Plaintiff Heilmann also relied on YU's representations to his detriment. He chose to attend Yeshiva University (and to continue his enrollment there) based on the understanding that YU would provide a **safe, nondiscriminatory academic environment** consistent with its public promises and policies. YU's **Non-Discrimination and Anti-Harassment Policy** and its annual Security Report, for example, gave Plaintiff an expectation that the University had effective systems to prevent violence and address any misconduct swiftly and fairly. These were important factors in Plaintiff's decision to be part of the YU community. Had Plaintiff known the truth – that the University was, behind the scenes, tolerating or ignoring violence and discrimination, and prioritizing its reputation over student safety – he would not have entrusted his education and welfare to YU. As a direct result of YU's false statements and concealments, Plaintiff suffered physical and emotional harm (from the assault and lack of proper redress), **severe emotional distress** upon learning of the University's betrayal of its stated values, and **damage to his personal and professional reputation**. Being associated with YU, an institution now tarnished by scandal and duplicity, has stigmatized Plaintiff. He feels humiliation and mental anguish knowing that friends, family, and future employers may question whether

his alma mater (and by extension its students) condone deceit or unsafe practices. The value of his degree and the opportunities tied to YU's network have been diminished by the cloud of fraud hanging over the University. These damages are a foreseeable and intended result of YU's fraudulent scheme, which placed Plaintiff in an untenable position of either silently condoning the misconduct or suffering retaliation and reputational harm for opposing it.

17. **YU's Ongoing Concealment:** Even after some facets of the truth began to emerge (through Plaintiff's complaints to university officials, external legal action, or media coverage of YU's controversies), Yeshiva University has **continued to double down on misrepresentation**. YU officials have not issued any corrective disclosures to donors about the prior false statements. Fundraising communications have *persisted in omitting* the relevant facts. For instance, YU's development office continued to run its 2024 end-of-year fundraising campaigns celebrating the University's accomplishments and safety record, without mentioning the assault on Plaintiff or the discrimination lawsuit – despite both being matters of public record by that time. This ongoing concealment demonstrates YU's **reckless disregard for truth** and underscores the need for judicial intervention. YU cannot be permitted to profit from lies and cover-ups with impunity.

18. **Summary of Wrongdoing:** In summary, Yeshiva University **orchestrated a fraudulent scheme** to present a falsely pristine image to its donors and the public, thereby securing donations that it might not have received if the truth were known. It misrepresented or failed to disclose: (a) **campus safety incidents** (like the assault on Plaintiff) which belie its claim of a worry-free safe campus; (b) **instances of discrimination and non-compliance with laws**(such as Title IX and anti-discrimination statutes) which contradict its claim of inclusivity and integrity; and (c) **administrative misconduct** (obstruction, retaliation, and

Heilmann v. Yeshiva University| Fraudulent Solicitation of Donations and Public Misrepresentation | Case No. [TBD] | U.S. District Court – Southern District of New York

non-transparency) which stands in contrast to its implied promise of good governance. YU's actions were **intentional, malicious, and in bad faith**, as it placed financial gain and image above the truth and above the safety and rights of its students. As a result, Plaintiff and many others were deceived and harmed. The following Causes of Action detail the legal violations arising from these facts.

# Causes of Action

## Count I – Fraudulent Misrepresentation (Common Law Fraud)

19. **Misrepresentation of Material Facts:** Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein. Yeshiva University made **false representations of material fact**, and material omissions, to Plaintiff and to current and prospective donors. These misrepresentations include, inter alia, statements that YU's campus was extraordinarily safe and free of serious crime or violence, that YU does not tolerate or engage in discriminatory practices, and that YU's administration operates with honesty and transparency. YU also omitted to disclose material facts – namely, the occurrence of a violent assault on campus, the existence of serious discrimination and lawsuits, and the misconduct by YU officials in handling these issues – which rendered its affirmative statements misleading. All of these facts were material: a reasonable person (student, parent, or donor) would consider them important in deciding whether to associate with or donate to the University.

20. **Knowledge of Falsity and Scienter:** At the time YU made the above representations and omissions, YU **knew that they were false** or made them with reckless disregard for the

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva University| Fraudulent Solicitation of Donations and Public Misrepresentation | Case No. [TBD] | U.S. District Court – Southern District of New York

truth. YU's officers and agents had actual knowledge of the March 2024 assault on Plaintiff and other incidents of misconduct, as well as the ongoing LGBTQ+ club controversy and other discrimination issues, yet chose not to disclose these. YU's leadership also knew that it was presenting itself inconsistently in different forums (claiming secular, law-abiding status to government while asserting religious exemption to courts, and telling donors and students everything was under control). This demonstrates a conscious awareness that the reality did not match the representations. The misrepresentations were made **intentionally, willfully, and maliciously** with the intent to deceive donors and the public, and to induce reliance.

21. **Intent to Induce Reliance:** Yeshiva University made these misrepresentations and omissions with the **specific intent to induce** Plaintiff and others to rely on them. YU intended that donors would rely on the false narrative of a safe, inclusive, well-run university and thereby be motivated to donate money, and that students (like Plaintiff) and their families would rely on that narrative when deciding to enroll and remain at YU (which in turn generates tuition revenue and enhances YU's reputation, attracting more donations). The entire fundraising strategy of YU was predicated on painting a picture that would **inspire trust and confidence**, so that the University could financially benefit. YU's deceptive statements were not mere puffery; they were calculated lies or half-truths aimed at securing tangible financial contributions and retention of students.

22. **Actual and Reasonable Reliance:** Plaintiff and donors **reasonably relied** on YU's misrepresentations and were entitled to do so. Plaintiff, as a student, relied on the University's promises of safety and fairness – he paid tuition and remained at the school, and did not transfer or take other actions, because he believed YU's assertions that it was

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

addressing any issues appropriately and that the campus was as safe as claimed. Donors likewise relied on YU's representations in making donations – for example, donors contributed funds to YU believing they were supporting an institution aligned with their values of safety, non-discrimination, and ethical governance. Many of these donors would not have donated (or would have donated less) had they known the truth. The reliance was reasonable because YU is a position of authority and trust; donors and students naturally accept the University's official statements as truthful, absent any red flags. YU cultivated that trust and thus cannot now claim anyone was unreasonable to believe what YU was telling them.

23. **Damages Caused by Fraud:** As a direct and proximate result of YU's fraudulent misrepresentations and omissions, Plaintiff has suffered damages. These damages include **emotional distress, mental anguish, reputational harm, and other non-economic damages**, as well as out-of-pocket and economic consequences (such as the loss of the benefit of the safe environment and services for which he paid tuition, and costs associated with addressing the aftermath of the assault and discrimination). Plaintiff was effectively deprived of the benefit of his bargain as a student: he paid for and expected a safe, supportive university experience as advertised, but received a dangerous and hostile environment instead. Additionally, the goodwill associated with his education has been impaired, affecting his career and future prospects. In fraud, these intangible injuries are compensable because they flow from Defendant's willful deceit. Furthermore, the fraudulent scheme was a substantial factor in donors providing funds to YU; while those donors themselves are not plaintiffs here, the fact that their money was obtained under false pretenses establishes **context for punitive damages** and the egregious nature of YU's

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva University| Fraudulent Solicitation of Donations and Public Misrepresentation | Case No. [TBD] | U.S. District Court – Southern District of New York

conduct. Plaintiff, involuntarily entangled in YU's deceit (as both victim and unwilling poster-child of a "successful" institution), has experienced personal humiliation and suffering. He seeks damages in an amount to be determined at trial, but in any event well above the jurisdictional minimum, to compensate for these injuries. Because YU acted with malice and intentional deceit, Plaintiff also seeks **punitive damages** under this count to punish YU and deter such conduct.

## Count II – Violation of 18 U.S.C. § 1341 (Mail Fraud)

24. Plaintiff re-alleges and incorporates all prior paragraphs. **Mail Fraud Statute (18 U.S.C. § 1341):** Defendant Yeshiva University engaged in a scheme or artifice to defraud and to obtain money or property by means of false or fraudulent pretenses, representations, or promises, and **used the United States mails** in furtherance of that scheme, in violation of 18 U.S.C. § 1341.

25. **Scheme to Defraud via Mail:** As described above, YU devised and carried out a scheme to defraud donors and the public by soliciting charitable donations under false pretenses. YU prepared and sent out materially false and misleading solicitation letters, brochures, reports, and other mailings to donors and prospective donors. These mailings contained the misrepresentations regarding campus safety, non-discrimination, and institutional integrity (or omitted material adverse information), with the intent that recipients would be deceived and would donate funds as a result. For example, YU's annual donation appeal letters in 2023 and 2024 each touted the University's "outstanding record in campus security and student welfare" and highlighted its values, without any mention of the then-recent assault

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva University| Fraudulent Solicitation of Donations and Public Misrepresentation | Case No. [TBD] | U.S. District Court – Southern District of New York

or internal issues. Such statements were knowingly false and were part of YU's fraudulent scheme.

26. **Use of U.S. Postal Service:** In executing this scheme, YU caused items to be delivered by the United States Postal Service (or private interstate carriers) according to the direction on the items. Specifically, YU's Office of Institutional Advancement (Development) mailed solicitation packets and newsletters to thousands of households nationwide (including to addresses in this District). Each mailing was an **instance of use of the mails** furthering the fraudulent scheme, as the mailings were the vehicle conveying the deceptive narratives to donors. Without these mail communications, YU would not have been able to solicit and obtain the volume of donations it did under false pretenses.

27. **Intent and Knowing Use:** YU's use of the mails was **knowing and intentional**. The decision to send fraudulent statements by mail was not a mistake – it was a core component of the fundraising strategy. YU knew that the mailings contained misrepresentations or half-truths and nevertheless approved them for dissemination. This conduct violates the federal mail fraud statute, which prohibits using the mail system to carry out a fraudulent scheme.

28. **Predicate Act and Damages:** YU's violations of 18 U.S.C. § 1341 are actionable here as predicate fraudulent acts causing injury to Plaintiff. While mail fraud is a criminal statute typically prosecuted by the government, the **conduct constituting mail fraud** also gives rise to civil claims (e.g., as predicate acts under civil RICO or as independent wrongdoing underpinning state law claims). In this case, YU's mail fraud has caused direct harm to Plaintiff as described: it enabled the perpetuation of the fraudulent scheme that ensnared Plaintiff. The donations obtained via mail fraud financed the environment in which Plaintiff

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

was victimized and kept him in the dark about critical issues. Additionally, YU's use of mail fraud reflects such moral turpitude and wanton dishonesty that it justifies an award of **punitive damages** and treble damages as allowed by law. Plaintiff seeks relief including compensatory and punitive damages for YU's mail fraud as part of the overall fraudulent scheme.

## Count III – Violation of 18 U.S.C. § 1343 (Wire Fraud)

29. Plaintiff re-alleges and incorporates all prior paragraphs. **Wire Fraud Statute (18 U.S.C. § 1343):** Defendant Yeshiva University also engaged in fraudulent conduct using interstate wires, including telephone, internet, and email communications, in furtherance of its scheme to defraud, in violation of 18 U.S.C. § 1343.

30. **Scheme to Defraud via Wires:** Parallel to its use of the mails, YU utilized electronic communications to carry out the same deceptive fundraising scheme. YU sent out blast emails to alumni and donors, posted misleading information on its official website and social media pages, and conducted phone calls or teleconferences with major donors – all to propagate the false narrative of a wholly safe and upstanding institution. For instance, YU's fundraising emails in late 2024 linked to web pages boasting about campus safety initiatives and student success, without any disclosure of the recent violent incident or discrimination issues. YU's website features (and featured at relevant times) prominent statements about its commitment to student safety and values, thereby acting as a continuous misrepresentation accessible via the internet (an instrument of interstate commerce). In personal calls or meetings (which often involve interstate phone lines or electronic communications to schedule), YU representatives reassured concerned donors that YU

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

"takes every measure to ensure student safety and wellbeing," which was misleading given what was being concealed.

31. **Use of Interstate Wires:** The above electronic communications traveled via interstate wires. Emails from YU's servers (located in New York) were sent to donors and alumni located in various states (and countries). The YU website is accessible nationally and globally, and by hosting false or misleading content on that site, YU engaged in the use of interstate electronic communications. Additionally, any phone communications crossed state lines when donors outside New York were contacted. These uses of wire communications were integral to the fraudulent scheme, allowing YU to rapidly and broadly disseminate its misrepresentations.

32. **Intent and Knowing Use:** YU **knowingly and intentionally** used wire communications to further its fraudulent scheme. The University's staff crafted email content and web content with the intent to deceive. YU's leadership approved these communications despite knowing the information was incomplete or false. This conduct was willful and violates 18 U.S.C. § 1343, which makes it unlawful to transmit materially false or fraudulent pretenses by means of wire, radio, or television communication in interstate commerce for the purpose of executing a scheme to defraud.

33. **Predicate Act and Damages:** YU's wire fraud, like its mail fraud, is part and parcel of the overall fraud perpetrated on Plaintiff and others. The use of electronic communications significantly expanded the reach and impact of YU's falsehoods, thereby deepening the harm. Plaintiff's injuries – including the continuation of his enrollment under false pretenses and the reputational/emotional harm suffered – are directly tied to YU's ability to maintain the façade via constant communications. YU's violation of the wire fraud statute

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

constitutes a predicate act of racketeering and egregious misconduct that warrants civil redress. Plaintiff seeks damages and appropriate relief for the injuries caused by YU's wire fraud. Furthermore, the Court should award **punitive/exemplary damages** in view of YU's deliberate misuse of modern communication channels to deceive the public; such an award will serve to punish YU and deter similar conduct by other institutions.

## Count IV – Violation of New York General Business Law § 349 (Deceptive Acts and Practices)

34. Plaintiff re-alleges and incorporates all prior paragraphs. **NY GBL § 349** prohibits **"deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]."** Yeshiva University's conduct as described above constitutes multiple deceptive acts and practices in violation of § 349.

35. **Consumer-Oriented Conduct:** YU's fraudulent solicitations and public misrepresentations were **consumer-oriented**. Although YU is an educational and charitable institution, it engages in commerce by marketing its educational services to students (who pay tuition and fees) and by soliciting donations from the public. The deceptive practices were not limited to a private contract or a single victim; they were disseminated broadly to the public at large as part of YU's ongoing business of attracting financial support and enrollment. YU's fundraising campaigns and promotional materials are essentially advertisements aimed at consumers of its "product" (education and the associated affiliation with YU). This broad outreach to influence consumer decisions (enrollment, donations)

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

brings YU's conduct squarely within the ambit of GBL § 349, which is intended to protect the public from exactly this sort of *systemic deception*.

36. **Misleading Acts and Material Falsehoods:** YU's acts and statements were **misleading in a material way**. A practice is deceptive under § 349 if it is likely to mislead a reasonable consumer. Here, YU's false claims about safety and integrity, and its failure to disclose serious problems, would mislead a reasonable prospective student or donor into believing YU was safer and more accountable than it actually was. As detailed, YU's promotional content created the false impression of an environment free of certain risks (violence, discrimination) and a culture of strict ethical adherence. These impressions were materially false. The fact that even sophisticated parties (such as major donors and educated parents) were misled underscores how *plausible and effective the deception was*. The existence of undisclosed assaults and discrimination is the type of information that a reasonable person would expect to be truthfully disclosed or not contradicted by official statements. By providing a false narrative, YU violated generally accepted standards of honesty and fair dealing.

37. **Injury to Plaintiff (and Public):** Plaintiff suffered an **actual injury** as a result of YU's deceptive acts. The injuries include those enumerated earlier: emotional distress, reputational damage, and out-of-pocket expenses related to the aftermath of the incidents (such as medical expenses, therapy costs, or security measures following the assault – to the extent incurred by Plaintiff). In the context of GBL § 349, "injury" can be established by proof that the plaintiff was misled and thereby suffered some harm. Plaintiff was misled into attending/continuing at YU under false pretenses; thus, he paid for services (tuition, housing, etc.) that were not as advertised (a safe, non-discriminatory environment) –

essentially a form of economic injury. Moreover, Plaintiff's subsequent emotional and reputational harms are direct consequences of YU's deception coming to light and the events that transpired under the deceptive conditions. In addition to Plaintiff's individual injury, YU's conduct has *wider ramifications* for the public interest: countless other students and donors were exposed to the same deceptions. The public's trust in charitable and educational institutions has been shaken, which is precisely the type of harm § 349 is meant to redress by discouraging deceptive practices.

38. **Bad Faith and Willfulness:** YU's deceptive acts were committed willfully and in bad faith. Evidence will show that YU had internal deliberations balancing "how much to tell" vs. "how it would affect donations," demonstrating an intentional choice to deceive. Such willfulness can entitle the Plaintiff to enhanced damages and an award of attorneys' fees under GBL § 349 (had Plaintiff been represented by counsel – as a pro se, Plaintiff simply highlights the egregiousness to justify punitive measures).

39. **Relief under GBL § 349:** Pursuant to NY GBL § 349(h), Plaintiff seeks to **enjoin YU's continued deceptive practices** and to recover his actual damages or $50 (whichever is greater) and treble damages up to $1,000 (if applicable) for YU's willful or knowing violations of the statute, as well as costs of the action. While these statutory damage amounts are relatively modest, the law does not preclude additional recovery of actual damages beyond the statutory minima. Plaintiff therefore also seeks all **actual damages** sustained due to YU's deceptive conduct, in an amount to be proven at trial. The Court should also issue appropriate injunctive relief prohibiting YU from making false or misleading statements in the future, and requiring corrective disclosures to the public about the matters misrepresented herein, in order to prevent further harm.

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva University| Fraudulent Solicitation of Donations and Public Misrepresentation | Case No. [TBD] | U.S. District Court – Southern District of New York

*(If and to the extent necessary, Plaintiff may also plead additional causes of action or legal theories such as unjust enrichment, constructive fraud, negligent misrepresentation, or civil RICO (18 U.S.C. § 1962) predicated on the mail and wire fraud described, to fully vindicate his rights. However, for purposes of this Complaint, the counts set forth above capture the core wrongdoing and provide the basis for relief.)*

# Prayer for Relief

WHEREFORE, Plaintiff Yisrael Z. Heilmann respectfully requests that the Court enter Judgment in his favor and grant relief against Defendant Yeshiva University as follows:

- **A. Compensatory Damages:** An award of **compensatory damages** to Plaintiff in an amount to be determined at trial, but believed to be in the **hundreds of thousands of dollars (or higher)**, for the losses and injuries suffered as a result of Defendant's wrongful conduct. This includes damages for Plaintiff's emotional distress, pain and suffering, mental anguish, reputational harm, loss of educational opportunities and benefits, and any economic losses incurred due to YU's fraud and deception.

- **B. Punitive Damages:** An award of **punitive and exemplary damages** in an amount sufficient to punish Yeshiva University for its malicious, willful, and fraudulent conduct and to deter similar conduct in the future. Given the egregious nature of the fraud – involving an abuse of public trust and affecting many stakeholders – Plaintiff seeks punitive damages at the **maximum level credibly supported by the evidence** (potentially several million dollars, subject to proof at trial and the sound discretion of the jury). Such an award

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva University| Fraudulent Solicitation of Donations and Public Misrepresentation | Case No. [TBD] | U.S. District Court – Southern District of New York

is justified to send a clear message that fraudulent solicitation of charitable donations and deceit of the public will not be tolerated.

- **C. Injunctive and Equitable Relief:** Appropriate **injunctive relief** ordering Yeshiva University to cease its deceptive solicitation practices and to issue **corrective disclosures**. This may include a requirement that YU notify its donors and alumni of the true facts regarding the incidents and issues referenced in this Complaint, and a prohibition against YU making false statements about campus safety or related material facts in the future. Plaintiff also seeks any necessary measures to monitor YU's compliance (such as Court oversight or an independent auditor) to ensure transparency going forward. Additionally, Plaintiff seeks **disgorgement** or restitution of any unjust enrichment obtained by YU through its fraudulent appeals, to the extent permitted by law, such that YU does not profit from its wrongdoing (for example, any donations proven to have been given solely due to the misrepresentations should be set aside or used for genuine safety and compliance improvements, rather than for general funds).

- **D. Attorneys' Fees and Costs:** An award of **costs of this action**, and to the extent allowable, reasonable attorneys' fees. (Plaintiff notes he is prosecuting this case *pro se*, but should he later retain counsel or if fee-shifting statutes are applied, he seeks recovery of fees in the interest of justice, particularly under GBL § 349 which provides for attorneys' fees to a prevailing plaintiff.)

- **E. Pre- and Post-Judgment Interest:** An award of **pre-judgment interest** and **post-judgment interest** on all monetary damages, at the highest legal rate, from the date the injuries were sustained or from such time as the Court deems appropriate, until the date of payment, to fully compensate Plaintiff for the loss of use of those funds.

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva University| Fraudulent Solicitation of Donations and Public Misrepresentation | Case No. [TBD] | U.S. District Court – Southern District of New York

- **F. Such Other Relief as the Court Deems Just and Proper:** Any further relief that the Court deems just, equitable, and proper, including but not limited to further legal or equitable remedies in favor of Plaintiff. This may include, if appropriate, declaratory relief acknowledging Defendant's wrongdoing, or any special relief needed to **restore Plaintiff's reputation** (such as a court-approved statement or apology from YU to be disseminated publicly).

**JURY DEMAND, RIGHT TO AMEND, AND NON-WAIVER OF RIGHTS**

**RIGHT TO AMEND**

Plaintiff expressly reserves the right to amend this Complaint, pursuant to Rule 15 of the Federal Rules of Civil Procedure, to conform to the evidence as it develops through discovery, to correct any technical or factual inaccuracies, and to assert additional claims, legal theories, or causes of action as may become necessary. This includes, without limitation, the right to add or substitute parties or claims that arise out of the same nucleus of operative facts. This reservation is asserted in the interest of justice, judicial economy, and full adjudication on the merits.

**NON-WAIVER OF RIGHTS**

Nothing in this Complaint shall be construed as a waiver of any rights, remedies, or legal theories available to Plaintiff under the Constitution, statutes, common law, or international law. Plaintiff explicitly and unconditionally reserves the right to assert any and all claims,

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

whether known or unknown, legal or equitable, arising from the events, facts, conduct, omissions, or retaliatory actions described herein or discovered through ongoing investigation or discovery. This includes—but is not limited to—rights under Title VI, Title IX, 42 U.S.C. § 1981, § 1983, § 1985, the Americans with Disabilities Act, New York Executive Law § 296, and applicable international conventions and human rights frameworks. Furthermore, Plaintiff reserves the right to seek legal, injunctive, compensatory, punitive, or declaratory relief in any forum or jurisdiction, and nothing herein shall be interpreted to limit Plaintiff's pursuit of parallel remedies through civil, regulatory, or criminal proceedings.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable as a matter of right. Plaintiff respectfully invokes this constitutional entitlement with the utmost seriousness, recognizing that a jury of impartial peers is the proper authority to resolve the deeply factual, reputational, and retaliatory harms alleged herein. This demand applies to all claims, including those sounding in tort, statutory violations, and constitutional deprivations, and shall extend to any future amended or supplemental pleadings.

### PLAINTIFF PRO SE STATEMENT:

Plaintiff, **Yisrael Z. Heilmann**, appears pro se in this action.

Respectfully submitted,

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva University| Fraudulent Solicitation of Donations and Public Misrepresentation | Case No. [TBD] | U.S. District Court – Southern District of New York

Dated: April 28, 2025

**/s/ Yisrael Z. Heilmann**

**Yisrael Z. Heilmann, Plaintiff Pro Se**

Address: 447 Broadway

2nd FL 945

New York, NY, 10013

Email:   yzh2@protonmail.com

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*